Filed 8/27/25  Dowswell v. Bd. Of Administration of CalPERS CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DAVID DOWSWELL, | C100027 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2022-80003800-CU-WM-GDS) |
| v. | |
| BOARD OF ADMINISTRATION OF THE PUBLIC EMPLOYEES' RETIREMENT SYSTEM, | |
| Defendant and Respondent; | |
| REGIONAL GOVERNMENT SERVICES, | |
| Real Party in Interest and Appellant. | |

Twenty years ago, in *Metropolitan Water Dist. v. Superior Court* (2004) 32 Cal.4th 491, our Supreme Court held the Public Employees' Retirement Law (PERL) (Gov. Code § 20000 et seq.)[1] incorporates the common law test for employment, and that public

---

[1]     Undesignated statutory references are to the Government Code.

1

agencies that contract with California's Public Employees' Retirement System (CalPERS) are required to enroll their common law employees in CalPERS. In this case, the Board of Administration of CalPERS determined David Dowswell worked for the City of Dixon as a common law employee after he retired from public service, in violation of rules governing postretirement employment, and the trial court upheld that determination. Dowswell appeals, arguing (1) the Legislature has abrogated the common law test for employment in the circumstances of this case, (2) if the common law test applies, CalPERS and the trial court both erred when they found he was a common law employee, and (3) CalPERS's decision was based on underground regulations. We reject all three arguments and thus affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Dowswell began working for the City of San Pablo as a planning aid in 1975, and he became a member of CalPERS by virtue of that employment. He continued earning CalPERS service credit while working for the Town of Corte Madera and the Cities of Vallejo, Pinole, Albany and Dixon in various planning-related positions. He retired from the City of Dixon on September 30, 2011, after having served as its community development director for six years. He began receiving a retirement allowance from CalPERS on November 1, 2011.

Section 21220 provides that a retired person "may not be employed in any capacity thereafter by [a CalPERS covered employer] . . . unless the person has first been reinstated from retirement pursuant to this chapter, or unless the employment, without reinstatement, is authorized by" the PERL. (§ 21220, subd. (a).) Section 21221,

---

**2**     Much of the factual background is taken from the underlying administrative decision and the trial court's decision in this case. Both decisions contain numerous factual findings, most of which Dowswell does not challenge, and he cites both decisions extensively in his briefs.

subdivision (h), provides, "[a] retired person may serve without reinstatement . . . [u]pon interim appointment by the governing body of a contracting agency to a vacant position during recruitment for a permanent appointment and deemed by the governing body to require specialized skills or during an emergency to prevent stoppage of public business." Such interim appointments cannot exceed 960 hours per fiscal year, and the compensation cannot exceed the maximum amount paid to other employees performing comparable duties as listed on a publicly available pay schedule for the vacant position. (§ 21221, subd. (h).)

A.      *Dowswell's postretirement work for the City of Dixon*

After he retired, Dowswell continued to work for the City of Dixon (the City) as a retired annuitant. Effective October 10, 2011, the city council adopted a resolution appointing him as the City's "Interim Community Development Director . . . under the terms of Government Code 21221(h)," as quoted above. It was anticipated he would work three days a week, and he would be paid an hourly rate of $55.22, which was less than the maximum amount payable for the community development director position. Dowswell worked for the City pursuant to what we will refer to as the "interim appointment" until late 2013. He testified that, during this time, he "was . . . a direct employee of the City," and he continued to perform most of the job functions identified in the community development director job description.

At some point in time the City received a communication from CalPERS about the use of retired annuitants. According to Jim Lindley, the city manager at the time, it was his understanding based on this communication that the City could no longer use retired annuitants the way it had been. After speaking with the city attorney and the City's human resources director, Lindley recommended that the City contract with Regional Government Services (RGS) for Dowswell's services, and the city council adopted that recommendation on October 22, 2013.

3

RGS is a joint powers authority created by the Association of Bay Area Governments and the City of San Carlos. According to RGS's executive director Richard Averett, it was formed "to provide a way for smaller public agencies to obtain professional level . . . services in . . . the quantity that they needed, the amount that they needed, so that they were able to get top level talent without going to the market and hiring that top level talent." Effective November 1, 2013, Dowswell began working for the City pursuant to two separate RGS contracts: (1) an "Agreement for Management and Administrative Services" between RGS and the City; and (2) an "Employment Agreement" between RGS and Dowswell.

The agreement between RGS and the City provided RGS would assign Dowswell to work for the City as the "Community Development Director" at an hourly rate of $68.26. The "Scope of Services" included five specific projects: "Housing Element Update for 2014-2022"; "Update of Municipal Services Review"; "Process North Dixon Annexation"; "Adopt new Agricultural Mitigation Ordinance"; and "Process Porter Road Properties Rezoning." The agreement also stated Dowswell would perform "Other Duties" that were part of the "job description" for the position, and "related work as required."

The agreement between RGS and the City also provided: "It is understood that the relationship of RGS to the [City] is that of an independent contractor and all persons working for or under the direction of RGS are its agents and employees and not agents or employees of the [City]. . . . [¶] . . . [¶] [The City] shall not have the ability to direct how services are to be performed, specify the location where services are to be performed, or establish set hours or days for performance, except as set forth [herein]." It also provided: "RGS shall assign only competent personnel to perform services pursuant to this Agreement. In the event that [the City], in its sole discretion, at any time during the term of this Agreement, desires the reassignment of such person or persons, RGS shall consider reassigning such person or persons." Finally, it provided either party could

4

terminate the agreement "with or without cause, upon 30 days written notice," and the City "has the sole discretion to determine if the services performed by RGS are satisfactory . . . . If the [City] determines that the services performed by RGS are not satisfactory, the [City] may terminate this agreement by giving written notice to RGS."

The agreement between RGS and Dowswell provided Dowswell was an "at-will" "employee" of RGS, and he would act as "a Community Development Consultant for [RGS] assigned to various clients."[3] RGS would pay Dowswell $50.32 an hour. Either party could terminate the agreement on one day's written notice. The "Assigned Duties" identified in the agreement were largely the same as the "Scope of Services" identified in the agreement between RGS and the City. Dowswell testified these were the same duties he had performed when he was employed as the City's community development director.

Dowswell was asked why he entered into the agreement with RGS, and he responded that, after he had worked for the City on an interim basis for about a year and a half, "the City asked me to become a consultant, if I wanted to continue to work for the City." He also testified that "[t]he 960 hour issue . . . came into play," and he had "started looking at alternatives" that would allow him "to conceivably work beyond the 960 hours. And one of them was becoming a consultant." He testified it was City Manager Lindley who made him aware of RGS. He explained, "we had been talking about the fact that I needed to become a consultant, that I couldn't continue to work under this interim title, . . . and I assumed that CalPERS had contacted the City and that was driving some of this. [¶] And so I had indicated to him that I had started looking into become a professional consultant . . . if needed. And he became aware of RGS and the fact that they could essentially eliminate the need for me to go out and become my own private consultant, that I could work under them, and then the City could hire me through RGS."

---

[3]     Dowswell also worked for two other cities pursuant to this agreement. His work for those cities is not at issue here.

And again: "Mr. Lindley had indicated that they had been contacted by CalPERS, that there was some issues involving my employment that I needed to look more like a consultant and less like an employee." It was Dowswell's understanding "that the 960 hour rule wouldn't apply" if he worked for the City through RGS.

While working for the City pursuant to the RGS contracts, Dowswell submitted his time to RGS, not to the City. RGS paid him and, and in turn, billed the City for the hours he worked. RGS provided him with a W-2. Dowswell acknowledged receiving RGS's personnel rules, and he considered himself bound by those rules. He did not recall whether he was also bound by the City's rules. RGS—not the City—was responsible for providing him with workers' compensation, disability insurance, sick leave required by law, and "anything else that the law might require that [an employer] provide to an employee." Dowswell set his own schedule "based on [his] workload and the need for the City to get certain tasks that [he] was working on accomplished within a time frame." He continued to use the same City e-mail address, phone number, and office he had used prior to retirement. Many of the things he worked on were things he had worked on prior to his retirement.

Dowswell acknowledged the community development director worked under the direction of the city manager. Prior to his retirement, Nancy Houston was the city manager. Dowswell was asked what sort of direction he received from her, and he responded, "[she] had no experience in my field whatsoever and relied . . . heavily on me knowing what to do on a day-to-day basis. [¶] And although I think she gave me general direction, she really expected me to know what my responsibilities were and expected me to keep her informed, if there was something that she needed to be made aware of." Lindley was appointed city manager in March 2012, about five months after Dowswell's interim appointment. Dowswell testified his interactions with Lindley were similar to his interactions with Houston: "Mr. Lindley came from a totally different background, had very little familiarity with what planners do, and relied on me heavily to know what to do

6

and inform him of what he needed to know as it related to . . . my responsibilities." Lindley "was . . . probably the most hands-off city manager that I ever worked for. He really relied on my abilities and to keep him informed, instead of the other way around." Dowswell testified his working relationship with Lindley was "similar" under both the interim appointment and the RGS contract.

Lindley testified Dowswell was "a highly skilled professional that had been doing that job for a number of years. So in my opinion, he didn't require much direction on our part. We just gave him a list of tasks and it was up to him how he accomplished those tasks."

As noted, Dowswell worked for the City pursuant to the RGS contracts for a little over a year and a half, from November 1, 2013, to June 30, 2015.

B. *The underlying administrative proceedings*

In February 2018, CalPERS began investigating the nature of Dowswell's relationship with the City, and in January 2020, it determined he was a common law employee and his employment violated the PERL's postretirement employment rules.

Dowswell appealed, and an evidentiary hearing was held before an administrative law judge (ALJ) from the Office of Administrative Hearings. Following the hearing, the ALJ issued a proposed decision finding Dowswell was a common law employee of the City, and his employment violated the postretirement employment rules,[4] and CalPERS adopted the ALJ's proposed decision in its entirety.[5]

---

[4] The ALJ found Dowswell violated these rules because he worked over 960 hours during the 2014/2015 fiscal year, and Dowswell does not challenge this finding.

[5] CalPERS made one minor modification that does not affect the outcome of this case.

## C.    *The trial court proceedings*

Dowswell challenged the decision by filing a petition for writ of mandate pursuant to Code of Civil Procedure section 1094.5.  He argued the evidence did not support the finding that he was a common law employee and the ALJ "made numerous errors of law" that were effectively adopted by CalPERS.  He also sought a judicial declaration that the challenged decision "is predicated on unlawful 'underground regulations' and, thus, is ultra vires."  The parties agreed the challenged decision implicated Dowswell's fundamental vested right to receive a retirement benefit, and the trial court was thus authorized to exercise its independent judgment on the evidence.[6]  Applying its independent judgment, the trial court found the evidence supported CalPERS's determination that Dowswell was a common law employee of the City.[7]  We will discuss the basis for the trial court's decision below.  Judgment was entered denying the petition, and Dowswell filed a timely notice of appeal.

Although not directly relevant to this appeal, we note the trial court related this case with four other cases that also involve CalPERS retirees who provided services to

---

[6]    "Section 1094.5 of the Code of Civil Procedure provides the basic framework by which an aggrieved party to an administrative proceeding may seek judicial review of any final order or decision rendered by a state or local agency." (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 137, fn. omitted.)  Where it is claimed the agency's findings are not supported by the evidence, two standards of review apply at the trial court level:  the independent judgment standard and the substantial evidence standard.  The independent judgment standard applies in cases where the agency's decision affects a fundamental vested right, and the substantial evidence standard applies in all other cases. (*Id*. at pp. 143-144.)

[7]    Dowswell states that, as a result of this determination, he "will suffer severe penalties" because he may be reinstated from retirement and required to reimburse CalPERS over $700,000.  He has filed an administrative appeal related to penalties but the issue has not yet been adjudicated.  The issue of penalties is thus not before us.

cities through RGS.[8] The petitioners in all five related cases challenged CalPERS's finding that they were common law employees. The trial court found in favor of the petitioner in one of the cases (*Abid-Cummings v. Board of Administration of the Public Employees' Retirement System*, Super. Ct. Sac. County, 2023, No. 34-2022-80003798 (*Abid-Cummings*)), and in favor of CalPERS in the other four cases, including this case, and the petitioners in those four cases all appealed. The other three appeals are: (1) *Sandhu v. Board of Administration of the Public Employees' Retirement System*, No. C100028; (2) *Souza v. Board of Administration of the Public Employees' Retirement System*, No. C099861; and (3) *Estate of Breeze v. Board of Administration of the Public Employees' Retirement System*, No. C099877. In February 2025, we issued a published decision affirming the judgment in the *Sandhu* case (and we note that Dowswell raises many of the same arguments that we resolved in the *Sandhu* case).

In his briefs, Dowswell relies extensively on the trial court's decision in the *Abid-Cummings* case. Like Dowswell, Linda Abid-Cummings worked for a city after she retired, and she worked pursuant to the same contract between the city and RGS that Dowswell worked pursuant to. Unlike Dowswell, however, the trial court found Abid-Cummings was not a common law employee of the city. It thus granted Abid-Cummings' petition for writ of mandate and entered judgment in her favor, and CalPERS did not appeal. Dowswell spends much time arguing the facts in this case are "virtually the same" as the facts in *Abid-Cummings* and criticizing the trial court for "contradicting" its analysis and findings in that case. He also asks us to judicially notice the trial court's decision and the transcript of the hearing in *Abid-Cummings*. We deny the request because "only *relevant* material may be [judicially] noticed," and the trial court's decision

---

[8] Both parties have asked us to judicially notice the related case order. We deny both requests as unnecessary because that order is already part of the record and thus does not need to be judicially noticed.

9

in *Abid-Cummings* is not relevant to our resolution of this appeal.  (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063, disapproved on other grounds in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276; see also *Pereira-Goodman v. Anderson* (1997) 54 Cal.App.4th 864, 872, fn. 5 [declining to take judicial notice of superior court decision and noting such decisions "do not have precedential value"].)  One of the primary issues in this case is whether the trial court's finding that Dowswell was a common law employee is supported by substantial evidence, not whether it is consistent with a contrary finding in a different case.  Accordingly, the trial court's finding that Abid-Cummings was not a common law employee—which finding was not appealed—is not relevant to this appeal.[9]

## DISCUSSION

Dowswell makes three arguments on appeal:  (1) the common law test for employment is not applicable to the facts of this case; (2) even if it is applicable, the trial court misapplied the test and/or erred in finding he was a common law employee; and (3) CalPERS's decision was based, at least in part, on underground regulations.  We discuss each argument in turn.  We note at the outset that Dowswell's briefs contain a total of 87 footnotes, many of which contain arguments not raised in the body of the briefs.  "Footnotes are not the appropriate vehicle for stating contentions on appeal" (*Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947), and we thus have not considered arguments raised only in footnotes (*Requa v. Regents of University of Californi*a (2012) 213 Cal.App.4th 213, 226, fn. 9).

---

[9]     For similar reasons, we deny CalPERS's request for judicial notice of the trial court's decision in the other related cases, and both parties' requests for judicial notice of other nonprecedential CalPERS decisions.

I

*The Common Law Test Applies*

Dowswell's first argument is that the common law test for employment does not apply because, under the circumstances of this case, it has been abrogated by sections 37103 and 53060. We disagree.

Pursuant to the PERL, CalPERS provides retirement benefits to its "members," who include "not only state employees but also employees of 'contracting agencies,' that is, public entities . . . that have chosen to participate in CalPERS by contract with the CalPERS governing board. (§§ 20022, 20460.)" (*Metropolitan Water Dist. v. Superior Court, supra*, 32 Cal.4th at p. 499 (*Metropolitan*).) Here, all of the cities that Dowswell worked for prior to his retirement were contracting agencies, as is the City of Dixon.

The PERL defines a " '[m]ember' " as "an employee who has qualified for membership in this system and on whose behalf an employer has become obligated to pay contributions" (§ 20370, subd. (a)), and an "employee[] of a contracting agency" (§ 20383), and it defines an " '[e]mployee' " as "[a]ny person in the employ of any contracting agency" (§ 20028, subd. (b)). "Membership in [CalPERS] is compulsory for all employees." (§ 20502, subd. (a)(3).) "As these provisions indicate, only an agency's *employees*—not those performing services for the agency on other terms—may be enrolled in CalPERS. The PERL makes this rule explicit in section 20300, subdivision (b), which excludes from CalPERS membership '[i]ndependent contractors who are not employees.' " (*Metropolitan, supra*, 32 Cal.4th at p. 499.)

In *Metropolitan, supra*, 32 Cal.4th 491, our Supreme Court held the PERL incorporates the common law test for employment to distinguish employees from independent contractors. Like this case, *Metropolitan* involved a public agency that contracted with CalPERS to provide retirement benefits to its employees, and also contracted with several labor suppliers to provide it with temporary workers. (*Metropolitan* at pp. 496-497.) The agency considered the workers to be consultants

11

rather than employees and it did not provide them with benefits that were contingent on employment. (*Id*. at p. 497.) A group of workers sued the agency, arguing they were employees and were entitled to all employment-related benefits, including membership in CalPERS, and the trial court permitted CalPERS to intervene in the action. (*Id*. at pp. 497-498.)

Prior to trial, the trial court decided a threshold issue and ruled the agency was required to enroll all common law employees in CalPERS. (*Metropolitan, supra*, 32 Cal.4th at p. 498.) The parties sought review of that ruling by petition for writ of mandate, the appellate court denied the petition, and our Supreme Court granted review to decide what it deemed a "purely legal" issue: whether the PERL required a contracting agency "to enroll in CalPERS all workers who would be considered [its] employees under California common law." (*Metropolitan*, at p. 496; see *id*. at p. 498.) The agency argued, "it may exclude from enrollment workers, such as plaintiffs, who are paid through private labor suppliers, even if they would be employees under the common law test." (*Id*. at p. 496.) The court disagreed, holding, "the PERL incorporates common law principles into its definition of a contracting agency employee and that the PERL requires contracting public agencies to enroll in CalPERS all common law employees except those excluded under a specific statutory . . . provision." (*Ibid*.)

The court began its analysis by noting, "As to contracting agencies, the PERL gives the term ['employee'] no special meaning, stating simply that an 'employee' means '[a]ny person in the employ of any contracting agency.' (§ 20028, subd. (b).)" (*Metropolitan, supra*, 32 Cal.4th at p. 500.) It then explained, "In this circumstance—a statute referring to employees without defining the term—courts have generally applied the common law test of employment," and, "[u]nless given reason to conclude the Legislature must have intended the term to have a different meaning in section 20028, subdivision (b), we also can only adhere to the common law test." (*Id*. at pp. 500, 501.) Finally, it concluded, "the PERL's provision concerning employment by a contracting

12

agency (§ 20028, subd. (b)) incorporates a common law test for employment, and . . . nothing elsewhere in the PERL . . . supports reading into the PERL an exception to mandatory enrollment for employees hired through private labor suppliers." (*Id*. at p. 509.)

RGS is analogous to a labor supplier that provides workers to contracting agencies, and *Metropolitan* teaches that if those workers meet the common law test for employment, then they are employees for purposes of the PERL.

Dowswell highlights a dissenting opinion in *Metropolitan* that found the common law test should be modified in cases involving labor suppliers like RGS and so-called leased workers like Dowswell. The dissent noted, "[l]eased workers present a new paradigm" that is based on "a three-sided labor relationship" as opposed to the more traditional two-sided labor relationship. (*Metropolitan, supra*, 32 Cal.4th at pp. 512, 514 (dis. & conc. opn. of Brown, J.).) It also noted that when the common law employment test was developed, "employee leasing in its purest form did not even exist. Thus, it differentiates only between employees and independent contractors, not employees and leased workers." (*Id*. at p. 514 (dis. & conc. opn. of Brown, J.).) The dissent thought "[c]ommon law rules that evolved to address the traditional two-sided labor paradigm are simply inapposite in this [new three-sided] context," and it suggested the common law test needed to evolve to specifically address leased workers. (*Ibid*. (dis. & conc. opn. of Brown, J.).) In particular, it believed that, in leased worker situations, the intent of the parties should be "the principal consideration in determining plaintiffs' employee status."[10] (*Metropolitan*, at p. 515 (dis. & conc. opn. of Brown, J.).) The dissent thus would have found the leased workers at issue were independent contractors because the public agency that retained them through a private labor supplier "intended to

---

[10] As discussed below, the intent of the parties is just one of numerous secondary factors that courts may consider under the common law test, but it is not determinative.

avoid entering into an employer-employee relationship with [them], and they, in turn, willingly accepted their jobs on the terms offered." (*Ibid.* (dis. & conc. opn. of Brown, J.).) Under the dissent's view, Dowswell might well be found an independent contractor, because that appears to be what all three parties (i.e., Dowswell, the City, and RGS) intended. A dissent, however, is just that—a dissent—and it is axiomatic that dissents are not the law. (See *People v. Lopez* (2012) 55 Cal.4th 569, 585.)

The *Metropolitan* majority acknowledged the dissent's concerns, and noted, "Nothing we say here precludes the Legislature, if it so chooses, from amending the PERL to declare leased workers to be the employees of the labor suppliers." (*Metropolitan, supra*, 32 Cal.4th at p. 508.) The Legislature has not done so. After the *Metropolitan* decision was issued in 2004, the Legislature amended three of the statutes cited by the court to hold the PERL incorporates the common law test of employment, but none of the amendments addressed labor suppliers or leased workers or created different rules for them. (See *Metropolitan*, at pp. 499-500, 506, 508 [citing §§ 20370, 20300, & 20028]; Stats. 2007, ch. 355, § 9 [amending § 20370]; Stats. 2008, ch. 322, § 2 [amending § 20300]; Stats. 2007, ch. 355, § 2 [amending § 20028].) " 'The Legislature is presumed to have knowledge of existing judicial decisions when it enacts and amends legislation. When the Legislature amends a statute that has been the subject of judicial construction, changing it only in part, the presumption is that the Legislature intended to leave the law unchanged in the aspects not amended.' " (*Chango Coffee, Inc. v. Applied Underwriters, Inc.* (2017) 11 Cal.App.5th 1247, 1253.) Thus, the Legislature's decision to amend the PERL without addressing the *Metropolitan* court's conclusion that it contains no exception to mandatory enrollment for leased workers hired through labor suppliers suggests the Legislature intended to leave that conclusion unchanged and has not seen fit to adopt the dissent's view. "In other words, the Legislature has not seen a need to enact legislation to counter the decision in" *Metropolitan*. (*William S. Hart Union High School Dist. v. Regional Planning Com.* (1991) 226 Cal.App.3d 1612, 1624;

14

see also *In re Marriage of Sahafzadeh-Taeb & Taeb* (2019) 39 Cal.App.5th 124, 141 [if the Legislature thought a case interpretated a statute incorrectly, "it could have, and undoubtedly would have, said so and taken corrective action" when it amended the statute].)

Despite *Metropolitan*'s holding that the PERL incorporates the common law test for employment, Dowswell contends that test does not apply because sections 37103 and 53060 have effectively abrogated it in the circumstances of this case.[11] (*Metropolitan, supra*, 32 Cal.4th at p. 496.) We disagree.

Section 37103 provides a city "may contract with any specially trained and experienced person, firm, or corporation for special services and advice in financial, economic, accounting, engineering, legal, or administrative matters."[12] Similarly, section

---

[11] Dowswell also cites a third statute, section 54981, which provides, "The legislative body of any local agency may contract with any other local agency for the performance by the latter of municipal services or functions within the territory of the former." However, he never discusses this statute or explains its applicability to this case, and we thus do not address it.

[12] Dowswell asks us to judicially notice some of the legislative history of section 37103. Although legislative history is subject to judicial notice, we deny the request because Dowswell makes no attempt to explain how this legislative history is relevant or how it helps us interpret section 37103. (See *People v. Investco Management & Development LLC* (2018) 22 Cal.App.5th 443, 471, fn. 8 [denying request to judicially notice legislative history because it is "not relevant to a material issue in this case"].) Dowswell's sole mention of this legislative history is in a footnote where he states only that he "has obtained the legislative history of Government Code § 37103." It is not our job to comb through the legislative history to develop an argument on Dowswell's behalf. (See *Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1206, fn. 11 ["It is not our responsibility to develop an appellant's argument"].) Dowswell also asks us to judicially notice some of the legislative history of section 7522.56, but he never mentions this legislative history in his briefs or explains its relevance to this case, and we thus deny that request as well. We deny Dowswell's request that we judicially notice CalPERS Publication No. 33 ("A Guide to CalPERS Employment After Retirement") for similar reasons (i.e., he never mentions this document in his briefs or explains its relevance to this case).

53060 provides any public or municipal corporation (which includes a city) "may contract with and employ any persons for the furnishing . . . [of] special services and advice in financial, economic, accounting, engineering, legal, or administrative matters if such persons are specially trained and experienced and competent to perform the special services required." Dowswell argues the City exercised its statutory authority to "contract" for "special services" when it entered into its contract with RGS. This may be true, but it is not relevant because nobody is contending the City lacked authority to enter into a contract with RGS for Dowswell's services. Instead, the issue in this case is whether Dowswell was an employee within the meaning of the PERL when he was performing those special services for the City.

Dowswell argues, variously, that: (1) sections 37103 and 53060 have preempted or abrogated the common law; (2) "[t]he power to contract for specialized services necessarily means that the RGS contract describes the legal relationship [between the City and Dowswell] even if one or more common law criteria of employment might exist"; and (3) "the plain language of Government Code § 37103 grants [the City] the right to utilize contracting rather than direct employment as a means to obtain specialized services from RGS and RGS's assigned employee, Dowswell." Dowswell's argument is not entirely clear. It appears, however, that he contends the fact that sections 37103 and 53060 use the word *contract*—i.e., a city "may contract . . . for special services"—means that any person providing such special services is, ipso facto, an independent *contractor*. Not so.

The fact that cities are authorized to contract for special services says nothing about whether the person providing those services is an independent contractor or an employee. And as our Supreme Court has held, " 'the employment relationship is fundamentally contractual.' " (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 335.) Thus, contracting for special services is perfectly compatible with finding the person providing those services is an employee. Indeed, Dowswell was hired by RGS pursuant

16

to a contract that identified him as an employee, and RGS thus both *contracted* for Dowswell's services and *employed* him. Moreover, section 53060 provides a city may "contract with *and employ*" (italics added), a person to furnish special services, which appears to acknowledge that a person may be employed by contract, and, perhaps more importantly, to recognize that a person hired by a city pursuant to section 53060 may be an employee.

Dowswell cites case law that holds the common law is inapplicable when it has been modified by statute. (See, e.g., *Lowman v. Stafford* (1964) 226 Cal.App.2d 31, 39 ["when modified by state statutes, the common law is inapplicable in California"]; *Monterey Club v. Superior Court* (1941) 48 Cal.App.2d 131, 145 ["In California the common law is inapplicable where . . . it has been modified by our statutes"].) This is true, but there is nothing in the language of sections 37103 and 53060 that suggests either statute modifies the common law test for employment for purposes of the PERL.

Dowswell also cites the statement in *Metropolitan* that, "[u]nless given reason to conclude the Legislature must have intended the term ['employee'] to have a different meaning . . . , we . . . can only adhere to the common law test." (*Metropolitan, supra*, 32 Cal.4th at p. 501.) Again, however, nothing in the language of sections 37103 or 53060 gives us reason to conclude the Legislature must have intended to modify the meaning of the term "employee" for purposes of the PERL when a city contracts for special services. Indeed, we note that section 37103 does not contain the term "employee" or any variation thereof, much less define the term, and section 53060 uses the term "employ" without further definition and would thus appear to be governed by *Metropolitan*'s holding that when a statute refers to employment without defining the term, "courts have generally applied the common law test." (*Metropolitan*, at p. 500.)

Dowswell argues we must harmonize the PERL with sections 37103 and 53060 and must give effect to each statute. We agree. As our Supreme Court has emphasized, " 'A court must, where reasonably possible, harmonize statutes, reconcile seeming

17

inconsistencies in them, and construe them to give force and effect to all of their provisions.' " (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 805.)  Here, however, we find no inconsistency or conflict between the PERL's utilization of the common law employment test, and a city's authority to contract for special services pursuant to sections 37103 and 53060.  Instead, we harmonize and give effect to all of these statutory provisions as follows:  If a contracting agency contracts with a person or a firm for special services as authorized by sections 37103 and 53060, then the common law employment test is used to determine whether the person providing those services is an employee for purposes of the PERL (in which case the person must be enrolled in CalPERS), or an independent contractor (in which case enrollment is not required).

Dowswell cites *Handler v. Board of Supervisors* (1952) 39 Cal.2d 282 and *Kennedy v. Ross* (1946) 28 Cal.2d 569, for the proposition that "[p]ersons performing specialized services on a temporary basis have been held to be neither officers nor employees of the governmental body."  Neither case stands for the proposition that a person performing specialized services can never be deemed an employee, and neither case deals with the issue raised here.

In *Handler*, a county entered into a contract with an attorney and an engineer to assist the district attorney on a discrete project, and one of the issues was whether the attorney and the engineer could be hired by resolution of the board of supervisors, or whether they had to be hired pursuant to ordinances governing the employment of what the court referred to as "officers and regular employees."  (*Handler v. Board of Supervisors, supra*, 39 Cal.2d at p. 286; see *id*. at pp. 283-284.)  The court noted counties were authorized by law to contract with and employ persons to provide special services and advice in legal and engineering matters, and it held such persons could be hired by resolution.  In so holding, the court noted in passing that "[p]ersons performing specialized expert services do so on a temporary basis and are neither officers nor

18

[regular] employees, nor do they hold a position with the county. They are more akin to independent contractors." (*Id*. at p. 286.) The court did *not* hold that all persons performing specialized services on a temporary basis are independent contractors rather than employees for purposes of the PERL.

In *Kennedy*, a city entered into a contract with an engineer to furnish plans and specifications for a public works project. Someone filed a lawsuit against the city to restrain it from paying the engineer "on the ground that . . . the [engineer] had not been exempted by the civil service commission pursuant to certain provisions of the city charter." (*Kennedy v. Ross, supra*, 28 Cal.2d at p. 571; see *id*. at pp. 570-571.) As a result of the lawsuit, the city controller refused to pay the engineer, and the engineer sought a writ of mandate directing the controller to pay him. The controller argued the contract was illegal because it did not comply with the "civil service employment system" established by the city charter. (*Id*. at p. 571.) The city's civil service commission opined the engineer "was an independent contractor" and was not "subject to the civil service provisions of the charter." (*Id*. at p. 572.) The court agreed, noting that, "[t]he provisions of the charter do not foreclose the [city] from entering into contracts with individuals for the performance of professional services as independent contractors," and the civil service system created by the charter only applies " 'to persons *employed in permanent positions* in municipal departments.' " (*Id*. at pp. 572, 573.) As in *Handler*, the court did not hold that all persons performing specialized professional services for a city are independent contractors rather than employees for purposes of the PERL.

Dowswell also cites an Attorney General opinion for the proposition that section 53060 permits a public agency to employ persons with special skills to provide special services when those services cannot be provided by the agency's own employees. The issue in that case, however, was whether the special services could be provided by the agency's employees, not whether persons providing special services are employees or independent contractors. (19 Ops.Cal.Atty.Gen. 153, 155 (1952).)

19

The *Handler* and *Kennedy* cases and the Attorney General opinion contain no discussion of the common law test for employment, no discussion of the meaning of the term "employee" in the PERL, and no discussion of any other issue that is relevant to this case, and it is axiomatic that "case[s] [are] not authority for propositions not considered and decided." (*Picerne Construction Corp. v. Castellino Villas* (2016) 244 Cal.App.4th 1201, 1214-1215.)

In sum, we find nothing in sections 37103 and 53060 affects the holding in *Metropolitan* that contracting agencies are required to enroll all common law employees in CalPERS.

II

*Substantial Evidence Supports the Trial Court's Conclusion that Dowswell Was a Common Law Employee*

Dowswell next argues the trial court's finding that he was a common law employee is not supported by the evidence. We disagree. We first describe the common law test and the trial court's application of that test. We then discuss the applicable standard of review. Finally, we explain why the trial court's finding that Dowswell was a common law employee is supported by the evidence.

A.    *The common law test*

"The distinction between independent contractors and employees arose at common law to limit one's vicarious liability for the misconduct of a person rendering service to him. The principal's supervisory power was crucial in that context because ' . . . [the] extent to which the employer had a right to control [the details of the service] activities was . . . highly relevant to the question whether the employer ought to be legally liable for them. . . .' [Citations.] Thus, the 'control of details' test became the principal measure of the servant's status for common law purposes." (*S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 350 (*Borello*).) "Following common law tradition, California decisions . . . uniformly declare that '[t]he principal test

20

of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired.' " (*Ibid*.)  Our Supreme Court has emphasized that "what matters under the common law is not how much control a hirer *exercises*, but how much control the hirer retains the *right* to exercise." (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 533 (*Ayala*).)  "Perhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because '[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities.' " (*Id.* at p. 531.)

Although "the right to control work details is the 'most important' or 'most significant' consideration," courts also consider other factors or " 'secondary' indicia of the nature of a service relationship." (*Borello, supra*, 48 Cal.3d at p. 350.)  These other factors include:  "(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee." (*Id*. at p. 351; see also *Tieberg v. Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 949 (*Tieberg*).)  These factors " 'cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' " (*Borello*, at p. 351.)

B.     *The trial court's ruling*

The trial court found the weight of the evidence supported CalPERS's determination that Dowswell was a common law employee.  It first found the City had

the right to control his work as evidenced by the fact that it could terminate his services without cause. It noted, "Dowswell was specifically identified as the RGS staff that would be performing under the City Contract [with RGS], and that contract permitted the City to terminate the contract without cause with 30-days['] notice. Accordingly, the City could effectively terminate Dowswell's services with it." The trial court acknowledged the contract between RGS and the City stated the City could not direct how Dowswell's work was to be performed, but it found "the parties' actual conduct established otherwise." It noted, "Lindley was ultimately responsible for the work of the City's Community Development Department, which included the work Dowswell performed for the City as an RGS consultant, and Dowswell believed he was subject to Lindley's administrative direction." It thus found, "the control factor weighs in favor of an employee-employer relationship."

The trial court then discussed the secondary factors.[13] It found three secondary factors weighed in favor of an employment relationship: (1) the work Dowswell performed was part of the regular business of the City; (2) the work was usually done by a City employee under the supervision of the City; and (3) Dowswell was paid by the hour rather than by the job (although it found this factor weighed only "slightly in favor of an employee-employer relationship"). It also found three secondary factors were either neutral or not relevant in the circumstances of this case: (1) the skill required was

---

[13]     In a footnote, the trial court briefly noted one of the secondary factors is "whether the one performing services is engaged in a distinct occupation or business" (*Borello, supra*, 48 Cal.3d at p. 351), and it stated, "The work Dowswell performed for the City as an RGS consultant is not distinct from the City's regular business." Dowswell does not discuss this factor other than to state the following: "That RGS and its employee Dowswell had a distinct business of consulting based on RGS' staff expertise is clear from both the Dowswell employment agreement and RGS-City contract." There is no citation to the record and no further discussion or analysis of this factor, and we thus do not consider it further.

neutral because Dowswell was performing work that was typically performed by a highly skilled City employee; (2) who supplied the tools and the place of work was not relevant because the services Dowswell was providing were intellectual, and case law teaches "the factor of ownership of tools is of little importance where the service to be performed is an intellectual endeavor" (*Tieberg*, *supra*, 2 Cal.3d at p. 954); and (3) the length of time the services were performed was neutral because Dowswell's services were only needed until the City permanently filled the position. Finally, the trial court disregarded the one factor that weighed in favor of an independent contractor relationship—the belief or intent of the parties—because, "[c]ourts ignore the parties' characterization [of their relationship] if their actual conduct establishes a different relationship." (*Vendor Surveillance Corp. v. Henning* (2021) 62 Cal.App.5th 59, 84.)

C.      *Standard of review*

In a case such as this one, "[w]here the trial court has independently reviewed an administrative agency's factual findings, an appellate court applies the substantial evidence test to *the findings of the trial court*." (*Davis v. Civil Service Com.* (1997) 55 Cal.App.4th 677, 686, italics added.) "In applying the substantial evidence test, '[the] appellate court focuses on the findings of the trial court, rather than those of the administrative agency.' " (*Hittle v. Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 388, fn. 9.) The substantial evidence test is deferential. "We must uphold the trial court's findings unless they are ' " 'so lacking in evidentiary support as to render them unreasonable.' " ' " (*Molina v. Board of Administration, etc.* (2011) 200 Cal.App.4th 53, 61.) "[W]e must draw all legitimate and reasonable inferences in favor of the trial court's decision." (*Bell v. Department of Motor Vehicles* (1992) 11 Cal.App.4th 304, 309.) " 'The judgment will be upheld if there is any substantial evidence in support of each of the trial court's essential findings; all contrary evidence will be disregarded on appeal.' " (*Hittle*, at p. 388, fn. 9.)

Dowswell argues we must review the finding that he was an employee de novo, giving "no deference" to the trial court's decision. We disagree.

"The determination of employee or independent-contractor status is one of fact if dependent upon the resolution of disputed evidence or inferences, and the [agency's] decision must be upheld if substantially supported. [Citation.] If the evidence is undisputed, the question becomes one of law [citation], but deference to the agency's view is appropriate." (*Borello, supra*, 48 Cal.3d at p. 349.) Numerous cases hold, "[t]he question whether one is an independent contractor on the one hand or an . . . employee on the other, is *ordinarily* one of fact, the determination of which by the trial court on substantial evidence will be binding on the reviewing tribunal." (*Rogers v. Whitson* (1964) 228 Cal.App.2d 662, 672, italics added; see also *Vendor Surveillance Corp. v. Henning, supra*, 62 Cal.App.5th at p. 75 ["Determining whether a person is an employee or an independent contractor is *generally* a question of fact if it depends on resolving disputes in the evidence" (italics added)]; *Brose v. Union-Tribune Publishing Co.* (1986) 183 Cal.App.3d 1079, 1081 ["Whether a person is an employee or an independent contractor is *ordinarily* a question of fact" (italics added)].) The question of whether a person is an employee or an independent contractor becomes a question of law "only if the evidence is undisputed" (*Becerra v. McClatchy Co.* (2021) 69 Cal.App.5th 913, 948), or if the evidence supports only one credible conclusion (*Borello*, at p. 349), or "if from all the facts only one inference may be drawn" (*Brose*, at p. 1081).

Dowswell contends the question of whether he was an employee or an independent contractor is one of law because the evidence in this case is undisputed. We acknowledge that much (but not all) of the evidence is undisputed. However, this is not a case where only one inference or conclusion may be drawn from the evidence. Our task is thus to decide whether the trial court's decision is supported by substantial evidence.

*D.*      *Analysis*

　　*i.*      *Indicia of RGS Employment*

Dowswell's first argument is that the trial court erred by failing to consider the indicia of his employment relationship *with RGS*.

The issue in this case is whether a common law employment relationship existed between Dowswell and the City, not whether a common law employment relationship existed between Dowswell and RGS and the trial court correctly noted, "the working relationship at issue is the one between Dowswell and the City."

In this regard, we note that a long line of case law recognizes that dual employment or coemployment may exist when an entity like RGS supplies workers to clients such as the City. As our Supreme Court has explained, "The possibility of dual employment is well recognized in the case law. 'Where an employer sends an employee to do work for another person, and both have the right to exercise certain powers of control over the employee, that employee may be held to have two employers.' " (*Kowalski v. Shell Oil Co.* (1979) 23 Cal.3d 168, 174; see also *Martinez v. Combs* (2010) 49 Cal.4th 35, 76 [noting there may be "situations in which multiple entities control different aspects of the employment relationship. This occurs, for example, when one entity (such as a temporary employment agency) hires and pays a worker, and another entity supervises the work"].)

Indeed, in *Metropolitan* itself, our Supreme Court recognized the possibility that, in a case such as this one, where an entity like RGS supplies workers to clients like the City, a particular worker could have "coemployers" who "share or allocate between them certain responsibilities of employment." (*Metropolitan, supra*, 32 Cal.4th at p. 506.) Much like Dowswell does here, the labor suppliers in *Metropolitan* argued, "the PERL . . . should be construed to recognize coemployment," and to hold that "labor suppliers, rather than their clients . . . should be deemed the employers for purposes of the PERL, thus excluding workers they supply from the public retirement system." (*Ibid*.) The

25

court rejected this argument, holding, "No legitimate basis exists . . . for finding a coemployment exception to the PERL." (*Ibid*.) It also noted the Legislature has recognized that leased workers are "a special case in certain contexts," but has *not* "provided in the PERL for any coemployment exception to a contracting agency's duty to enroll [common law] employees in CalPERS. The only relevant legislative choice to date has been to require enrollment of all persons in the 'employ' of the contracting agency." (*Ibid*.) And, as discussed above, it held the PERL incorporates the common law test of employment.

We note there was no suggestion in *Metropolitan* that indicia of a common law employment relationship between the leased workers and the labor suppliers was relevant to the issue of whether the leased workers were common law employees of the contracting agency for purposes of the PERL. Thus, we agree with the trial court that the only relevant question in this case is whether Dowswell was a common law employee of the City.

ii.      *The Trial Court's Application of the Common Law Test*

Dowswell's second argument is that the trial court "failed to apply the uncontroverted evidence in a manner consistent with the law."[14] We understand this to mean either that the trial court misapplied the common law test, or that its findings about the various factors are not supported by substantial evidence, or both. We start with the trial court's finding on the primary factor—the right to control—and then consider its findings on those secondary factors that Dowswell discusses.

_____

[14]      Dowswell also argues the trial court failed to apply the evidence "in a manner consistent with . . . *Abid-Cummings*." As discussed above, the trial court's decision in *Abid-Cummings* is not relevant.

26

### a. The Primary Factor–the Right to Control

As noted above, " '[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired.' " (*Borello, supra*, 48 Cal.3d at p. 350.)  As also noted above, case law teaches, "[p]erhaps the strongest evidence of the right to control is whether the hirer can discharge the worker without cause, because '[t]he power of the principal to terminate the services of the agent gives him the means of controlling the agent's activities.' " (*Ayala, supra*, 59 Cal.4th at p. 531.)

Dowswell argues the City had no power to terminate his employment—only RGS had that power.  If the City was not satisfied with his services, its only recourse was to terminate the RGS contract or request another RGS advisor.  That is essentially what the trial court found as well:  i.e., it found that the City could effectively terminate Dowswell's relationship with it, even if the City could not terminate Dowswell's relationship with RGS.  The evidence supports the trial court's findings.

The City/RGS agreement provided it could be terminated by either party "with or without cause," and also provided the City could request another advisor if they were not satisfied with Dowswell's work.  Dowswell asserts, "The right to cancel the RGS contract is fundamentally different from the right to terminate Dowswell's services," but he fails to explain why this is so.  In either event, Dowswell would no longer be providing services to the City.  We thus agree that, pursuant to the terms of the City/RGS agreement, the City could effectively terminate Dowswell's services *with it* if it was not satisfied with his work, either by terminating its contract with RGS or by requesting a different advisor.  Dowswell's testimony supports the trial court's finding as well; he testified that he believed he could "be let go at the whim of the city" while he was working pursuant to the RGS contract.  And as noted above, case law teaches that the City's right to terminate Dowswell's services without cause (or at its "whim") gave it " 'the means of controlling [his] activities.' " (*Ayala, supra*, 59 Cal.4th at p. 531.)

27

Dowswell argues the evidence shows the City did not actually exercise control over his work. This may be true, but it is not dispositive because, as noted above, "what matters under the common law is not how much control a hirer *exercises*, but how much control the hirer retains the *right* to exercise." (*Ayala, supra*, 59 Cal.4th at p. 533.) " 'If the employer has the authority to exercise . . . control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists.' " (*Tieberg, supra*, 2 Cal.3d at p. 949.) "[I]t is not the control actually exercised, but that which may be exercised which is determinative." (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 875.) Dowswell acknowledged the city manager had the right to exercise control over him before he retired (and it was undisputed he was an employee before he retired), and he testified his interactions with the city manager were similar both before and after he retired, and both during his interim appointment and while working under the RGS contracts. Moreover, the City's municipal code provides the city manager has the "duty" and the "power[]" "[t]o exercise control over all departments of the City," (Dixon Mun. Code, § 2.09.040),[15] which would include the community development department, and the city council resolution that authorized the RGS agreement stated its purpose was "for Community Development Department staffing needs." This evidence supports a finding that the city manager had the power to exercise control over whoever was fulfilling those staffing needs pursuant to the RGS agreement.

Moreover, to the extent the city manager did not actually exercise control over Dowswell, this is easily explained by the fact that the work he performed was typically performed by a highly skilled employee with extensive experience. Christina Rollins, who manages CalPERS's membership and postretirement employment determination

---

[15]   We grant Dowswell's request to judicially notice the Municipal Code.

team, testified, "when you get to these higher level positions, . . . you need specialized skills a lot of times to do these jobs. So they don't really require a lot of direction or a lot of oversight . . . of the day-to-day work of that individual." Lindley and Dowswell echoed this. Lindley testified Dowswell was "a highly skilled professional that had been doing that job for a number of years" and thus "didn't require much direction on our part." And Dowswell testified Lindley "came from a totally different background, had very little familiarity with what planners do, and relied on me heavily to know what to do."

In sum, the evidence is sufficient to support the trial court's finding that the City had the right to control Dowswell's work, even if it rarely, if ever, exercised that right.

### b. The Secondary Factors

Dowswell also challenges a few of the trial court's findings regarding the secondary factors. He does not challenge all of them, however, and we will assume any finding that is not challenged is supported by substantial evidence. (See, e.g., *Cameron v. Sacramento County Employees' Retirement System* (2016) 4 Cal.App.5th 1266, 1278 ["factual findings not contested must be accepted as true"].)

One of the secondary factors is "the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision." (*Borello, supra*, 48 Cal.3d at p. 351.) As the trial court accurately recognized, "This factor focuses on how the work 'is usually done' in a given locale, not how the work was done in this particular case." (*Vendor Surveillance Corp. v. Henning, supra*, 62 Cal.App.5th at p. 80.) The trial court found the work Dowswell did for the City was "usually done under the supervision . . . of a higher-level City employee." Dowswell does not directly challenge this finding, and we will thus assume it is supported by substantial evidence. (*Cameron v. Sacramento County Employees' Retirement System, supra*, 4 Cal.App.5th at p. 1278.) Instead, Dowswell argues general supervision is insufficient to establish control, because even true independent contractors

may be generally supervised.[16] While this may be true, it does nothing to undermine the trial court's finding that the work Dowswell did was usually done under the supervision of a City employee. Dowswell testified that, pursuant to the RGS contracts, he worked on several of the same tasks or projects that he had worked on before he retired; before he retired, he was employed as the City's community development director; the community development director's job description states the person holding that position is an "employee" who works "under the administrative direction of the City Manager"; and Dowswell testified the city manager directed his work prior to his retirement. The work Dowswell did was thus usually done by a City employee under the direction and supervision of a higher-level City employee. Although this secondary factor is not dispositive, it does weigh in favor of an employer-employee relationship.

The only other secondary factor Dowswell addresses is "whether or not the work is a part of the regular business of the principal [here, the City]." (*Borello, supra*, 48 Cal.3d at p. 351.) The trial court found the work Dowswell did "fell within the ambit of the City's Community Development Department and would have been performed by the City's Community Development Director if the position was not vacant." The trial court thus found this secondary factor weighed in favor of finding an employment relationship, and Dowswell tacitly acknowledges this finding is supported by the evidence. Indeed, at the hearing in the trial court Dowswell's counsel stated, "in all these cases, yes, the RGS advisors were brought into work on something that we freely admit was part of the regular business of the City."

---

[16] Here, Dowswell appears to conflate the primary factor (i.e., the right to control) with this secondary factor (i.e., whether the work is usually done under the direction of an employer). Whether the City had the right to control Dowswell's work is a different question than whether Dowswell's work was usually done under the direction of the City.

Dowswell asserts, however, that "[e]ven if land use planning is 'part of the regular business' of a city, the Legislature has authorized a city to arrange for that regular business to be performed either by independent contractors or employees, at the discretion of the city." This appears to be a reiteration of Dowswell's first argument—i.e., that sections 37103 and 53060 have abrogated or modified the common law rule and allow cities to contract for special services. We thus reiterate our conclusion above—i.e., that although sections 37103 and 53060 allow cities to contract for special services, the common law employment test is used to determine whether the person providing the special services is an employee or an independent contractor for purposes of the PERL.

Dowswell also asserts the trial court treated this factor (i.e., whether the work is a part of the regular business of the City) as "dispositive" or gave it "undue weight." The trial court did not treat this factor as dispositive. Instead, the trial court specifically stated this factor was a "secondary factor" that "weigh[ed] in favor of an employee-employer relationship." Moreover, Dowswell fails to convince us the trial court gave this secondary factor undue weight. Again, although this secondary factor is not dispositive, is does weigh in favor of an employment relationship rather than an independent contractor relationship.

In sum, the trial court's findings that the primary factor and three of the secondary factors weigh in favor of an employment relationship are either supported by the evidence or are not challenged by Dowswell. Moreover, Dowswell does not challenge the trial court's findings that three of the secondary factors are neutral or inapplicable in the facts of this case. Finally, he does not challenge the trial court's finding that the one factor that weighs in favor of an independent contractor relationship—the intent of the parties—is not sufficient to overcome the other factors. We therefore find the trial court's conclusion that Dowswell was a common law employee is supported by substantial evidence.

## III

### *The Underground Regulations Argument*

Dowswell's final argument is that CalPERS's decision was impermissibly based on underground regulations and is thus "ultra vires." We reject this argument as well.

The Administrative Procedure Act (APA) (§ 11340 et seq.) establishes detailed procedural requirements that state agencies must follow when adopting regulations, including providing the public with notice of any proposed regulations, giving interested parties the opportunity to comment thereon, and responding to comments in writing. (§ 11346; see generally §§ 11346.2, 11346.4, 11346.5, 11346.8, 11346.9.) The APA defines the term " 'regulation' " broadly to include "every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure." (§ 11342.600.) A rule subject to the APA thus has two identifying characteristics: (1) "the agency must intend its rule to apply generally, rather than in a specific case"; and (2) "the rule must 'implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's] procedure.' " (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 571 (*Tidewater*).) A rule that meets this definition is a regulation and is subject to the APA even if the agency calls it something different like a "guideline," a "policy," or a "bulletin," and even if it is unwritten. (Cal. Code Regs., tit. 1, § 250, subd. (a) [APA applies to any "guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule" that meets definition of regulation]; *Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, 336 [policy need not be written in order to be subject to APA because "[w]e decline to endorse an approach that would allow an agency to avoid APA requirements simply by driving its regulations further underground"].) A regulation that is adopted without following the APA's procedures is known as an "underground

regulation" (*Missionary Guadalupanas of Holy Spirit Inc. v. Rouillard* (2019) 38 Cal.App.5th 421, 432), and underground regulations are void and may not be used or enforced by the agency (§ 11340.5, subd. (a); *Tidewater*, at p. 572).

Dowswell argues that CalPERS is utilizing "unwritten and undefined common law criteria" and/or "[a]n unwritten agency interpretation" of the law. We presume he contends CalPERS's use of the common law test to determine whether someone is an employee or an independent contractor is improper because it has never adopted a regulation stating it uses that test and identifying the criteria it considers when applying that test. Assuming this is his argument, we reject it. CalPERS uses the common law test because our Supreme Court has interpreted the PERL and held it incorporates that test to distinguish employees from independent contractors. (*Metropolitan, supra*, 32 Cal.4th at p. 496.) "[A]n agency is mandated to follow the judicial interpretation of a statute." (*Capen v. Shewry* (2007) 155 Cal.App.4th 378, 390.) CalPERS is thus required to apply the common law test. Moreover, a long line of California cases explains how to apply the common law test and what factors to consider. (See, e.g., *Borello, supra*, 48 Cal.3d at p. 350; *Ayala, supra*, 59 Cal.4th at pp. 531-533; *Tieberg, supra*, 2 Cal.3d at p. 949.) Given this clear legal mandate and authority, CalPERS does not have to promulgate a regulation in order to apply the common law test.

Dowswell also complains about CalPERS's use of an "employment relationship questionnaire." CalPERS uses this questionnaire to obtain information from workers and public agencies in order to help it determine whether a particular worker is a common law employee. It contains questions like the following: "How were you hired?" "To whom do you report?" "Do you perform services pursuant to a formal job description or duty statement?" "For the services in question, did the agency provide you with any training?" "Is your work directed, supervised or reviewed by anyone?" "Does the agency have the right to control how you do your work?" And, "Who pays you?" Dowswell states the questionnaire "meets the APA's definition of a regulation, and as

such, is fundamentally flawed." That is the extent of his argument on this issue. An "appellant must present meaningful legal analysis supported by citations to authority . . . . [Citations.] When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' " (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) We need not consider "conclusory claims" (*ibid.*), or claims made without "intelligible legal argument" (*Berger v. Godden* (1985) 163 Cal.App.3d 1113, 1117), and would thus be well within our right to simply ignore this particular argument.

Even if we were to consider it, we note Dowswell cites no legal authority that holds a questionnaire meets the definition of a regulation. The APA expressly states it does not apply to "[a] form prescribed by a state agency or any instructions relating to the use of the form." (§ 11340.9, subd. (c).) Although the term "form" is not defined, we find a questionnaire is analogous to a form (see, e.g., *Tidewater, supra*, 14 Cal.4th at p. 572 [noting with approval that courts have held a checklist used by officers when administering intoxilyzer test is not a regulation]), particularly in the absence of any contrary legal authority from Dowswell.

Dowswell also asserts—again with no analysis—that the questionnaire fails to define critical terms like "control," "supervision," "reporting," and "training," and is thus "void for vagueness." He fails to explain how the use of undefined terms (that are not particularly vague) makes the questionnaire an underground regulation. The void for vagueness doctrine arises out of the due process clause—not the APA. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 890 ["the underpinning of a vagueness challenge is the due process concept of 'fair warning' "].) "To satisfy due process, a statute must be sufficiently clear to provide adequate notice of the prohibited or required conduct referred to therein. [Citations.] Thus, a statute will be deemed void for vagueness if it either forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess as to its meaning and differ as to what is required."

(*Nisei Farmers League v. Labor & Workforce Development Agency* (2019) 30 Cal.App.5th 997, 1012-1013.)  Dowswell cites no cases applying the vagueness doctrine to a questionnaire, and he cites no cases holding vague terms can make a questionnaire an underground regulation.

Dowswell's final argument is that CalPERS's application of the common law test "is inconsistent and arbitrary," and he asks us to judicially notice three nonprecedential CalPERS decisions that he contends demonstrate this inconsistency.  We deny the request because the decisions are not relevant to Dowswell's underground regulations argument. In each case the ALJ applied the common law test to the evidence introduced at the administrative hearing, and it is well settled that "interpretations that arise in the course of case-specific adjudication are not regulations."  (*Tidewater, supra*, 14 Cal.4th at p. 571; see also *Capen v. Shewry, supra*, 155 Cal.App.4th at p. 387 ["If the interpretation arises in the course of an enforcement proceeding involving the adjudication of a specific case it is not a regulation subject to the APA"].)

Dowswell's bigger argument may be that common law test itself can lead to inconsistent and unpredictable results.[17]  This may be true.  In the words of one court, " 'It is often a very elusive question whether a person under a given state of facts is an [employee] or an independent contractor,' " and "the difference between the two 'is not a line at all but a twilight zone filled with shades of gray." (*Richardson v. APAC-Mississippi* (1994) 631 So.2d 143, 149.)  As a result, courts "on quite analogous factual situations [have] reached opposite conclusions."  (*Ibid.*; see also Carlson, *Why the Law Still Can't Tell an Employee When It Sees One And How It Ought to Stop Trying* (2001)

---

[17]    Amici curiae made a similar argument in the *Sandhu* case when they stated the common law test "disincentivize[s]" "experienced retired annuitants and CalPERS contracting agencies . . . from entering into independent contracting agreements" "due to the risk" they will be deemed employees.  Dowswell asks us to judicially notice the amicus brief and CalPERS asks us to judicially notice its answer thereto, and we grant both requests.

22 Berkeley J. Emp. & Lab. L. 295, 335 ["However courts state the test of employee status, they routinely concede its failure to produce predictable results for many workers whose status is ambiguous"].)  Some inconsistency may be inevitable given that the common law test is a multi-factored test, and case law teaches, " 'the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' " (*Borello, supra*, 48 Cal.3d at p. 351.)  Thus, even a slight change in the facts can lead to different results.  (See, e.g., *Harger v. Structural Servs., Inc.* (1996) 121 N.M. 657, 667 [916 P.2d 1234, 1334] [" 'Every case presents its own combination of facts, from which the resultant must be arrived at.  A fact found controlling in one combination may have a minor importance in another' "].)  Indeed, our Supreme Court has noted that some courts and commentators contend one of the "significant disadvantages" of the common law test is the fact "that a multifactor, 'all the circumstances' standard makes it difficult for both hiring businesses and workers to determine in advance how a particular category of workers will be classified, frequently leaving the ultimate employee or independent contractor determination to a subsequent and often considerably delayed judicial decision.  In practice, the lack of an easily and consistently applied standard often leaves both businesses and workers in the dark." (*Dynamex Operations W. v. Superior Court* (2018) 4 Cal.5th 903, 954.)  The Legislature is free to amend the PERL to require CalPERS to apply a different and more predictable test, or to provide that workers providing services to public agencies through contracts with third parties like RGS are not employees of the public agencies.  Dowswell comes close to acknowledging that such a change must come from the Legislature when he states, "there is a need for a statutory exception to the traditional criteria for distinguishing between an employee and an independent contractor" when a third party is involved.  Unless and until the Legislature amends the PERL, however, we are bound by our Supreme Court's determination that "the PERL requires contracting public agencies to enroll in CalPERS all common law employees" as determined by application of "the

36

established common law test of employment." (*Metropolitan, supra*, 32 Cal.4th at pp. 496, 508.)

## DISPOSITION

The judgment is affirmed.  The parties shall bear their own costs on appeal.  (Cal Rules of Court, rule 8.278(a)(5).)


_____/s/_____
EARL, P. J.


We concur:


_____/s/_____
RENNER, J.


_____/s/_____
FEINBERG, J.